The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. IPC, please. All right. The next case we're going to hear is Menders v. Loudoun County School Board. And Mr. Sirr, we'll hear from you. Good morning, Your Honors. May it please the court. Daniel Sirr on behalf of the plaintiff appellate parents. I know in the last case, there was a little discussion of the procedural posture being 12 v. 6 and whether that made a difference. I think in our case, it makes a huge difference for the three different types of claims that are before you today. The first is an Arlington Heights claim, a claim looking at the legislative history and the intention behind the school board's policy. And frankly, I think that's the kind of claim that is really appropriately resolved on summary judgment. What the district court here did was look at the evidence attached to the complaint, drew several inferences in favor of the school board in its interpretation of that evidence, and then dismiss the claim. Do you counsel on that claim? You don't plead, as I read the complaint, that your clients or the ambassadors, nor did it plead that they wanted to be. That's correct, Your Honor. So how do you have an Article 3 injury if you haven't been denied anything or not even pursued something that you would like? What's your standing for this particular claim? Yeah, it's a great question. We're hoping for a great answer. I feel the pressure now. I think the simple answer, Your Honor, is my clients did not apply because they knew they would not be accepted. But you didn't plead that. I mean, you didn't plead we wanted to be one. I mean, you did plead that they would not be accepted. I think you did plead that, but you didn't plead that they would have applied or wanted to apply. So we've certainly plead that they want to be active participants in the school community, including sharing their views about these important issues, and that those views would not be welcome in this program. And we also plead that this is an important credential that would be useful for things like college admission, for instance, and that they wouldn't have access to that credential. But there was something in the beginning of the complaint where you alleged that the ambassadors had to support a position which your clients could not hold. That's correct, Your Honor. And if they could not hold that position, then they wouldn't even want to join. And rather that this whole ambassadorship was a student-government parallel type thing that was a benefit, they were being denied because of the position, the restriction. Is that roughly what... Yes, Your Honor, that is how I describe it. It was important for the college... Again, to draw on our last discussion, the previous case, there was a futility to it. My clients would not have fit the program that the school board created. And so rather than apply and be rejected, they decided to sue. But you agree, we can look at the complaint ourselves and review it. But you agree that to have standing, you would need to have either been denied that position particularly, or have wanted to be an ambassador and decided not to do it? I would agree that we have to show an injury. And the injury here is the exclusion from the program, that they did not seek to join the program because they would not have put forth. So the second claim we have is the viewpoint discrimination claim. It relates back to this initial discussion. But the viewpoint discrimination claim I think also in this 12B6 setting is more appropriate for summary judgment. In order to get there, we have to get over two hurdles that are illegal in nature. The first is the Buxton case. And as I think we explained in our briefs, Buxton is about access to a scholarship program. That's different than what we're talking about here, which is access to a forum. And forum isn't our label. Forum is actually the label that the school district uses multiple times to describe the parallel student government that they're creating. It's different from a radiology program, which is what this court did in Buxton. So why is it substantively different? So if you look at Buxton, Buxton has a line in there where it says, there's a difference between retaliation for speech and access to a forum based on speech you want to make. In Buxton, you're dealing with a radiology program, the purpose of which is not speech. It's not, you wouldn't look at a radiology program and say, that's a forum where people are going to engage in speech. You look at the student ambassadors program, the point is to hold these speak up, speak out meetings where the ambassadors get together and talk about what's happening in the school community. So the entire design is to be a forum. And the gate you have to pass through in order to get access to that forum is you have to subscribe to the viewpoints. They are both competitive programs, but one is a competitive program for a course of education, radiology degree. The other is access to a forum, right? So for the government to say, we're going to competitively select people to, students to participate in a forum, and we're going to use GPA as the basis for that standard, that would be fine. If the government said, we're going to let students into this forum, but we're only going to let Republican students into this forum, that would not be fine. Obviously, if they said in the radiology program, we're going to let... Boston has some language in it about that may be necessary in these competitive selection programs to consider viewpoints, that there isn't a prohibition on that, as long as it means some sort of rational basis analysis. So by remembering the language from that case correctly, yes, your honor, you are remembering it correctly. Buxton does give some leeway for the government to consider viewpoint. Although Buxton is ultimately not a forum case, right? Again, nobody looks at a radiology program and says it's a forum. This is very much a forum case. And the assumption in forum cases is that the rule of viewpoint neutrality applies. And the school district is trying to create an exception to the rule of school setting based on Hazelwood. And the problem for the school district is most circuits disagree with them on that. As we pointed out in our brief, there are a number of different circuits that have said schools cannot discriminate against students based on viewpoint. I mean, the Hazelwood, how that shakes down and viewpoint neutrality is obviously the subject of a lot of debate and interesting to go through that. But maybe I even step back to my question about the equal protection based on race claim. Certainly in a First Amendment context, the chilling of speech can be something in addition to discipline, so to speak. But here, and maybe your last claim on the bias report is more appropriate here. But here again, you haven't, it doesn't seem to me you've said that this, you said you have to become one. And you haven't said, I want to be a student equity ambassador and articulate these views. You want to articulate them generally, but you didn't say you, I want to be in there. As I read the complaint, it seems like your clients have a desire to speak about important public policy issues and have a viewpoint that they believe is inconsistent with the school and this program. But I haven't seen where you have been a pled that you've been denied admission or excluded or even wanted to, but didn't. And so it seems like you just have a, as pled, a disagreement with it. And I can appreciate that, but you haven't pled that you've been deprived of being part of it. Let me give, I think, a very simple example that if we use easier to access labels, maybe explains. So if the school district had a policy that said, we will have a forum, only Republicans are eligible. If my client was a Democrat, I don't think my client would need to apply to become a member of the forum and get rejected in order to have standing to come to this court. My client could say, I'm a Democrat. They're only allowing in Republicans, I'm being excluded. And that's essentially in a much more simplified way, what my clients are claiming. We don't hold these views about social justice. We don't hold these views about amplifying the voices of students of color. We're not going to apply because they're going to reject us because they don't want us. So if, in that you're hypothetical, I'm a, the Republicans, I can't remember who got in and who got out. But if you were in the other, the view of the other party, and you said, look, this is a club just for, or a program just for Democrats, I'm a Republican, but I hate school activities. I'd rather sit at home and, you know, read about this. And I have no interest whatsoever. It bothers me that there's a program for one party affiliation, not the other, but I have zero interest in being in that whatsoever. Are you saying that's a first amendment challenge? No, I think what's different here is my clients haven't said, we want to sit at home. My clients, they haven't said, we want to be in it either. Well, they said, we want to speak up about these issues, but we're not being allowed to in the forum the school has created. You're saying there, I don't think you said that. Maybe you do with respect to the bias report. I think you're saying you want to speak up on issues. I think you did plead that. And I think you said you can't be in the program if you have these views. That's as a matter of fact, but I didn't see where you said you wanted to be in. I'll double check to read back over there, but I'm just, there's a link there that I didn't think I saw, at least at first in my If you don't have it handy, you might come back on rebuttal and tell us the paragraph that answers that question. Because I think in your example, if you're the Democrat that wants to be in the club only for Republicans, your complaint would have to plead. I'm a Democrat that wants to be in this club and they're denying my permission. That's the part that I think Judge Quattlebaum and I are not sure of is in your complaint. I understand your honor. And I obviously would say the way Judge Niemeyer phrased it earlier is a helpful way to think about it. In the last few minutes, maybe we can turn to the bias response team. So again, this is a very interesting issue. The 5th, 6th and 11th circuits have all come out in it one way. I'm sure this court is most consideration of SANS, which is the 4th circuit's consideration of the Virginia Tech policy. That's very similar to this. Obviously, if this panel decides it's case prior to SANS, then it won't be bound by SANS. But it's the SANS panel, which was argued about two weeks ago, does decide it first. I think there are two important things to remember that distinguish this case from SANS. The first is that we're in a K-12 context. Sorry, what? K-12? Yeah, we're in K-12. And so, the pressure on a high school or middle school student is simply different than in a university setting. If you have a meeting with an administrator, and you're a 20-year-old young adult in the full flourish of your intellectual confidence, you might take that under advisement, but you're going to do what you're going to do. If you're a 7th grader, and you're called into the principal's office and told, please don't wear your red Make America Great Again hat, it makes other students feel uncomfortable. Or we'll send you to detention at the end of that sentence. I think the 7th grader receives it differently than the college sophomore. The second thing that distinguishes this case from SANS is that possibility of detention at the end. As I understand SANS, it's merely, you're going to get called into the dean of students office and told, your red hat makes other students feel uncomfortable, please don't wear it. In this instance, there's actually a box that you can check on the referral form that says, and please investigate this for discipline. And so if the reporting student chooses to check that box, there's the threat of discipline. And certainly in the 5th and the 6th circuits decisions in the speech first cases, that threat of discipline was very important. Counselor, if I could, I think in contrast to the issues I was kind of pressing earlier, I at least initially think there's allegations that talk about chilling as a result of this. I think the standing issue is less of an issue. It seems like the district court said required some level of punishment or restriction, which I get your disagreement with and think that you may have a point there. My question is this, you plead that there is already a disciplinary process at the school that can investigate and I guess punish or take action with respect to discriminatory type conduct. If that's in place, how does another program that does the same thing have any additional, if you will, Article 3 entry? And so I think the fact that the forum allows for the possibility of discipline just places that much more pressure to self-censor on my clients. Why do you say the forum allows for the possibility of discipline? I'm looking in response to your last answer at this past reporting forum. And the question is, would you like this particular incident investigated by the administrators at your school? And maybe it's implicit that it's for some disciplinary purpose, but the forum doesn't say that. That's true, your honor. That's the way the school board has in this case has represented that the forum works. That essentially if you file- In what way have they represented? At the district court and in their papers, the school board has consistently said there's basically two tracks. If you report only then that it's sent to the supervisor of equity. And then it is scheduled for discussion in front of the student equity ambassadors. If however, you check that box and you disclose your name, it is also essentially routed to your principal for investigation as a bullying incident, essentially, which can then lead to detention or whatever other problems are associated with bullying. And so though there is a bullying policy in place, I think the fact that you check a box and this is routed bullying, right? If anything, it's almost expanding. It's an overbreath claim. It's expanding what can now count as bullying to say, oh, if you do something that we consider biased, that then becomes the kind of thing that we're going to treat like harassing or bullying behavior. And you could be suspended for it. And so the school board's expansion, not expansion, the school board's use of the forum is just another way in which it is telling students, keep your views to yourselves. Don't speak up around school if you hold these dissenting views, because there is a hammer at the end of it if you do so. I see I'm over on time. I'll yield to my colleagues. All right. Thank you. All right. Mr. Selman. Mr. Selman. Good morning, and may it please the court. My name is Andrew Selman, and I represent the Loudoun County School Board, who is the defendant appellee in this matter. I think it's important if we start with what the selection criteria actually say. Our is that the thrust of plaintiff's complaints against the student equity ambassador program arise from what the selection criteria are. It's clear in the selection criteria that students... So you're reading from something. So if it's in the record, why don't you tell us what it is? This is on the joint appendix, page 116. This is the revised selection criteria. It says, if more than three students show interest, the administrator, counselor, and equity lead will use the recommended student attributes to determine which students will best serve their peers in this capacity. The previous paragraph, student attributes to consider when recommending students, and it includes a list of attributes, including honest, passion for social justice, sympathetic, sensitive, and so on. Nowhere in the selection criteria, and as far as we can tell alleged in the complaint, does it actually say that you must satisfy all of these requirements, you must have this viewpoint in order to participate in the program? You got a couple of problems with that particularized defense. First, that is an amendment of a prior list of criteria, which limited to persons of color. And so that was taken out. But then there was an inquiry about persons, white persons qualifying. And the answer was white persons could qualify as long as they were willing to amplify the voice of persons of color. And it seems to me that the changes were not structural. The changes might have been cosmetic because of the complaint. And that might be a factual question as to how it's actually being applied. I mean, the argument is that applicants have to be willing to enhance the voice of minorities and in favor of social justice as that has been defined and understood in that community. And the parents here say that they disagree fundamentally with that view. And my real question is whether all of this really has to be developed more talking deposition to the persons who created that, who wrote the memo, and the selection process may be of the 17 white persons that actually were there. There may be notes on them that indicate the criteria, how they're being applied. And the bigger question might be from your point of view is what difference does that make? Maybe it's okay to promote this in a form of this nature. But I was just pushing back a little bit on you're relying on just the narrow words on that page. And then just to follow up on that, the plaintiffs have pled specifically that. And we are at a 12B6 stage. They plead that those criteria, at one point, I think, is almost a format that is consistent with or effectively means a specific viewpoint. Now, again, to Judge Neumeier's point, facts may prove that not to be the case or not. But the allegations are not that's not the case. And given the terminology, that seems like an allegation that at least it's plausible. Certainly. And there's a lot to unpack there. But let me go point by point starting with count one. First of all, when dealing with a case like this in the Arlington Heights context, it's there's there is no explicit racial classification in the selection criteria that were applied. And so, in order to determine whether there is a discriminatory intent, which is what they must properly allege and show in order to make that claim. Well, would you agree that on the earlier version, there was a discriminatory intent? I think at this stage of I think that is that can be alleged or they've alleged on the earlier version. But it's important to note that this court in my follow up question would be then is the linkage between the first draft and the second draft and what change was made. And they have pleaded that the change was cosmetic and that it didn't change the way it functioned in any way. And if that's so, I don't know if it's so. But that's so that may be a gap in the facts right now. But the it sounds to me like the first action plan did identify you had to be a person of color and actually had to be Muslim or African American, I think. And all of that was removed. And persons of color could only be. In other words, the idea was to create a safe place or safe forum in which persons of color could talk about the issues and feel more supported and raise their spirits, I suppose, which seemed to be the purpose of the first one. But it also seems to discriminate on its face. And so that's in the second one, all of that language has been eliminated. The question is, what do we have? And the complaint seems to suggest it was carried on. Well, I think the fact that it was eliminated is. Well, the language is eliminated. They argue that it didn't change the substance. Well, it is true that the entire point, if we look at the historical background, that's one of the Arlington Heights factors. We look at the historical background of this program. The school division had historical problems of racial discrimination. It was one of the last school divisions to integrate in the state. And the school division conducted an equity audit. As a result of the equity audit, they learned that students of color and other minorities did not feel that they had a voice in the school division. They felt marginalized. There were no, there are no allegations that white students expressed similar sentiment as a result of this audit. And so the point of the program is to amplify the voices of students of color to remedy this. Well, I think that, as I understand the question Judge Niemeyer asked, you have a prior version of this program that appeared to have very explicit racially exclusionary requirements in it. And so then the question is, okay, they've changed it. Has it really changed that much? And looking at the first attribute that's in the current program, it talks about students who are honest and able to speak the truth. And I can't remember whether this is in the plaintiff's pleadings or maybe it's just in the argument. But for instance, they say that a student who expressed the view that society should be colorblind, for instance, that that would be deemed not the truth, that that would be deemed not honest. So if that were the I think it's important to note that this court in Raymond said, you know, that the legislature in that sentence, in this case, the school board is entitled to a presumption of good faith. And so you can't look at, and the court explicitly rejected this argument that, oh, in the past, they passed this discriminatory law. And then they passed another one. But we're going to look back at this original discriminatory law that's tainted this initial or this. Well, it's a little more subtle than that. You're right. The Raymond case imposes a presumption of good faith. But it doesn't say the prior discriminatory law was irrelevant. It just doesn't forever stain the future statutes. And so the question is, maybe not does the prior version doom the subsequent one, but is it relevant in any way? And sometimes you have to look into the facts. That's why some of these cases end up being at summary judgment. That is correct. That is correct. But the plaintiff's argument is placing the burden affirmatively on the school board to show that that taint has been purged. And that's simply not the way the law works. It sounds to me, and I don't know where this takes us, but it sounds to me like the entire program is a well-intentioned program to provide some kind of affirmative action to elevate the status and comfort of persons of color. As you pointed out, they had a problem there, and the persons felt suppressed and not listened to. So the school board comes along and says, we're going to do some affirmative action to try to correct that. I make that observation just to ask this question. The Supreme Court is going to be addressing affirmative action in the educational context. Is that relevant at all to this program? I don't believe that it is because as it was ultimately implemented, white students were not excluded from the program. This is not an issue of affirmative action where the issue is who may participate in the program. White students were not, in fact, excluded. In the interest of time, if I may turn to the viewpoint discrimination counts alleged, the school board's position is that Buxton is the appropriate framework for analyzing this. I don't want to take you off your course, but there was a fair amount of discussion with your colleague earlier on whether or not there was standing for the 14th Amendment Equal Protection Claim. Do you want to give us a quick synopsis of your view there? We have not discussed that in our brief, but our reading of the complaint and our understanding of what they have been alleging and arguing in the position they've taken in this is that the students in question did not apply and they did not express any interest in participating in the Student Equity Ambassador Program. I believe that the specific allegation is that they do not have the view, they do not believe in social justice as defined by the school board, but there's no allegations as to their desire to participate in the program or that they wanted to. Does that mean you think they do or don't have standing? I don't think that they have alleged an injury in this particular case as to participation in the program, other than a general disagreement for how the program is selected. Let me ask you this. If the school designs a vote program, which is to benefit a group of people, identified group of people, and the definition of the program excludes the students plaintiffs by definition, and they say it is a benefit that they've been denied, that's what was one of the allegations in this complaint, is that enough or do they have to who are not in that classification by definition, but in another classification, so we can discuss the same things or we can have the same benefit? As a general matter, I do believe it's enough to say they've been denied the benefit and that there's nothing, there's no comparable, never mind, I'm not going to say that. They have been denied the benefit. We don't believe that that has been alleged. Yeah, they alleged it's a benefit. They've been denied. They used the word benefit in the complaint. Okay, go ahead. If I may turn again to count two, we believe that Buxton is the appropriate framework for analyzing this case because it is a competitive program and the viewpoints, to the extent they have alleged a viewpoint at all that is being discriminated against, Buxton says that the government sitting in allocating these seats is able to take viewpoint in consideration. The Post and Council says that Buxton is substantively different here because Buxton was access to a, for lack of a better word, traditional academic program, but this, in their words, is access to a forum. And he says that that differentiates it in a significant way. I don't believe that that is, I don't believe that distinction is meaningful. They do allege in paragraph 44 that the Student Equity Ambassador Program is, you know, a formal office that it's a valuable credential for students. And so, because it is determined competitively, we believe that that is the appropriate principle to take from Buxton when it is a competitive allocation of spots that the viewpoint can be considered. Before your time runs out, I have a question about the form that is circulated available to students to fill out. And the form invites a comment or response to any incident of bias relating to a long list of subjects, including gender, religion, all kinds of other things on which people disagree. So, if we have a group of students talking about a controversial gender issue, and one student makes a comment and the other one gets a little heated about it, this system invites that person to file a complaint or fill out a form. And the consequence of the form is, number one, the subject will become a matter of the ambassador's discussion. Number two, it will be provided to teachers for learning. And number three, it can be referred to the school administration for investigation. My question is, they allege this is a ratting system. That's the word they used in the complaint, a snitching-type system. When you invite student-on-student snitching or student-on-student ratting about discussions they carry out in which there are disagreements about gender and that type of thing, isn't that a sufficient allegation that speech is chilled? I don't think so, because as this court said in Abbott, to have standing to assert a First Amendment claim, plaintiffs must show that there's a credible threat of enforcement such that the chill they allege is objectively reasonable. Well, we have to accept the program on its face. The program provides the form. It invites response to the form. It encourages it because it creates the discussion in the ambassador meetings. But it also has other consequences. And if this discussion among these students was heated and one gets mad at the other, she'll sign it and say, I want an investigation. Now, the student said, holy mackerel, I don't want that on my record, number one. And number two, my belief is just as good as yours. And all of a sudden, I'm going to be subjected to administrative investigation. Why isn't that an obvious chilling? But in Abbott, this court found that an administrative inquiry on its own without... Well, first of all, Abbott's a college case. And what it ends up saying is you have to... Certainly, to follow up on Judge Niemeyer, it says that if you have specific intended sort of statements and here, maybe unlike the other claims, there is very specific allegations about what they would talk about and what they feel they cannot talk about. So in the form itself, it seems like you're almost saying... I mean, the form, just the language on the form seems to indicate just on its face that certain measures that they are worried about can happen. It almost seems like you're putting them in a position that we have to do this, get in trouble, and then bring the claim. And that seems like that's inconsistent with both Supreme Court law and our law. My time has expired. May I address that? Please answer. I think that the important thing to keep in mind is if you look at what they're alleging and what they're basing their argument on, it stems from this idea of coercion from the school, from peer pressure, and that they're coerced into expressing or not expressing particular things. And they base those cases in large part on Levy-Wiseman and a stream of cases that specifically limit that to the school prayer. And while that concern is valid in that context... Well, let me ask you, I'm just reading their complaint here on this very issue. It says, this process, this form process, they said, it will kill them by creating a process for anonymously ratting out classmates for anything anyone finds offensive, with no burdens of proof or due process of protections. It's a heckler's veto in a kangaroo court. Now, the question is, if that is in fact proved that this invites students who are offended by what some other student says on a subject and can lead to discipline, maybe not discipline, but investigation, your argument is that doesn't chill? Our argument at the bottom is that that's not an enforcement. The standard is an enforcement. Something is being enforced, but they haven't pointed to or alleged anything that is being enforced here. And so, in conclusion, we would ask that the court... So, your argument basically is there's a standing issue, not a question on the substance. In other words, if it was shown, what they pled is shown, then there would be a First Amendment problem, but that they don't have any standing because it's not been enforced. Correct. For counts four and five, we are making a standing argument. Well, how do you know it's not being enforced? How do we know it's not being enforced? We haven't alleged that it is being enforced. It's a program. Isn't it a part of the formal program adopted by the school board? Well, it is, but what they haven't alleged is that as a result of the bias response form, anything has happened... They said it chills. That's the whole point of a chilling case is we're not speaking because we're worried that if we do, we'll suffer the consequences of this program, which will be detrimental to us. I... The standard is a threat. The chill has to be reasonable and without a threat of enforcement, which they haven't reasonably, plausibly alleged. You have to, in order to make that argument, you have to say that the form is not credible. That the procedure established is not credible. You're attacking your own procedure. Well, the... You've put in a procedure that invites any student to make a bias complaint about gender, about religion, about politics, about all kinds of things, race. And if a student is offended and makes a complaint about it, then your program has consequences. And I gave you the three consequences that is designed in the program. And so the plaintiffs allege that that chilled speech. And I asked you whether that... What's your position on it? And your basic position is I understand it is because they haven't enforced it, or at least it's not alleged, or there's no enforcement as alleged. They don't have standing. But the question is, if they say I've been chilled and I don't speak because of that, and that's what they are saying, set aside the standing. The question is, would that state a First Amendment claim? If that were objectively reasonable, which we do not believe that it is, that would state a First Amendment. All right. Thank you. Do we have some rebuttal? We do, Your Honor. There we go. Five minutes, but I'll try to be quick. So let me start... Five minutes, can you? Or you can be as quick as five minutes. I will do my best, Your Honor. So let me start by trying to answer Judge Agee's question from earlier about particular parts of the complaint. So I would point to paragraphs 13 through 17, which say that the children of the plaintiffs would not meet the criteria established by LCPS. And then again, in 59 and 60. And so the question obviously is, is that sufficient? And I would point to Judge Niemeyer's question to my colleague, that maybe one way to think about this is the injury is the exclusion, right? That my clients have alleged that they do not meet this, that they are being excluded from the program, and that that exclusion is the injury. And one way to maybe analogize that is to think about the Sixth Circuit's recent decision, which we discussed in the brief about the racial discrimination in the farm loan program. You may remember Congress forgave farm loans specifically for people of color, and white farmers sued to say that they were being excluded from that program. And the Sixth Circuit held that they were standing in that case. So I think that's maybe a good structure to think about where our injury arises from. The second thing I would just point to quickly, again, a question, Judge Agee, that you asked about Buxton to my counsel opposite. He answered, well, it's a valuable credential. And that's what we pled. That's true. Being a member of Congress is also a valuable credential. That does not mean that Congress is not a forum, right? Just because something is a valuable credential, being admitted to a forum can be a valuable credential. That doesn't mean it stops being a forum. And so obviously, we have alleged here... It's a bigger question. And I don't know the answer to this. But it sounds to me like the history, the purpose, the study, the program, the whole thing is a program designed to elevate the spirit and the participatory feeling of persons of color who have been excluded historically and maybe practically in the school system. So they design a program the best they can to try to identify the persons who are down and out. They've used Muslims and Blacks and then they use persons of color or whatever it is in the sense that these persons we want to bring into the community. And so they set up this program for that purpose. My question is, if that were at the general level, that sounds like some kind of affirmative action program. And the question is, I don't know whether affirmative action program to solve that problem is an appropriate or not appropriate. And that's why I asked about the Supreme Court's jurisprudence, which right now, in other contexts, permits affirmative action to create diversity. Here, it's affirmative action to try to elevate the participation of persons of color. If it were at that general level, is that constitutionally accepted? It is not, Your Honor. And let me make two points. The first is that the Supreme Court has consistently declined to say, and in fact has said the opposite of, that benign discrimination is still discrimination. Well, it is. And these cases in admissions policies, it clearly is because you're basing it on racer. But the question is, is it an acceptable process in the educational process where you're trying to teach students to be able to participate in a diverse and pluralistic society? And so you want to put together a group of students who have to learn to interchange with other, share cultural experiences. And that has sort of been the justification for whether you want to call it discrimination, but taking that into account. That's what the school board has done here. They have taken into account persons of color because of the historical context and the way persons of color are being treated in the school system. They want to address it. And they've tried to address it. Now, the question is in the big can they constitutionally address it by focusing just on a group like that? So, if we had substituted farm loan program in for forum for student voices in the situation you just set up, right? If we had said farmers of color have historically been victims of discrimination, farmers of color have historically been excluded from USDA programs, and they deserve affirmative recompense for their historic mistreatment. The Sixth Circuit and several other circuits just last year all refused to go down that road and said, no, the fact of historical discrimination is not sufficient to justify. But isn't, I mean, I'm generally familiar with those things, but both on the standing and on this issue, that seems different. Maybe it's a principle. I mean, on the standing issue, you automatically have financial differentiation. So, there's no choice to be made. So, I didn't, no offense, but I wasn't really persuaded on that as a great standing response. Yeah. And then on the merits, I'd have to go back and look at those cases, but I think there's a similar thread in there. When there's direct economic benefit, that's different than being able to express views. So, yeah, I think it's a fair, yeah, maybe a fair point. Neither party argued it, but if composition of or selection of the equity ambassadors has a racial component, not a determinative effect, I had the same thought that this has some earmarks, if you will, of, and we didn't get really any briefing from either side that that's part of our inquiry. Maybe. So, if we had said, there's a forum, it's open for students. If too many students apply, we'll use being a Republican as a tiebreaker. But clearly, that would be a violation of the First Amendment. And so, if the part of the response on the part of the board is, we've got multiple slots, but if we have too many students, then being in favor of social justice is the tiebreaker. It's a viewpoint. It's just a different viewpoint than Republican or Democrat. I'll just say very quickly on your point, Judge, about standing. I also would not lose sight of the fact that the board has not argued against standing. I realize standing is jurisdictional, but nonetheless, I think that should weigh a little bit. And then finally, Judge Niemeyer, I'll just end by quoting Chief Justice Roberts back on your original question. This is from Seattle Parents Involved, that the best way to stop discrimination based on race is to stop discriminating based on race. I know that that's a cute phrase, but somebody files a race discrimination case under Title VII, and the jury finds racial discrimination. We provide remedies that take race into account. We may require somebody to hire, require a reinstatement, this type of thing, based on race. So that when you have a violation of a — when you have discrimination and you create a particularized remedy, it necessarily has racial aspects to it. Now, the question is, how far back do you go to societal wrongs and how far back go? And these are big constitutional issues of a broad nature, and I'm sure you want to end discrimination. It seems to me it's one of our top policies in this country, is to address it and get it right and get everybody working harmoniously so that they don't have to and don't pay attention to race and color. And the way we come about it is what we're debating. And I must say that the school board's motive in this is clearly to try to — the question you're raising is whether they have addressed it in a constitutional fashion. And that's not an easy issue for us to tackle. Fair enough, Your Honor. All right. Thank you. We appreciate the arguments of counsel. It helps us. I've yet to get more confused, but we will think and do our best on it. We normally come down and would shake your hand, and we'll shake it virtually here. And thank you for your argument.
judges: Paul V. Niemeyer, G. Steven Agee, A. Marvin Quattlebaum Jr.